**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1827-WJM-NRN

RICHARD MAX FLEMING,

     Plaintiff,

v.

LARRY D. SIMS,
JEFFERY SIMS,
LDS FINANCIAL CHARTER SERVICES CO., and
BLACTINO ENTERTAINMENT,

     Defendants.

---

**ORDER ADOPTING IN PART, ADOPTING AS MODIFIED IN PART, AND REJECTING
IN PART OCTOBER 31, 2018 RECOMMENDATION OF MAGISTRATE JUDGE**

---

This matter is before the Court on United States Magistrate Judge N. Reid Neureiter's Recommendation dated October 31, 2018 (the "Recommendation"; ECF No. 237), which recommended that this Court (1) enter default judgment in favor of Plaintiff Richard Max Fleming ("Plaintiff") and against Defendant LDS Financial Charter Services Co.; and (2) grant in part and deny in part Plaintiff's motion for damages ("Motion for Damages"; ECF No. 219). The Recommendation is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Plaintiff filed a timely Objection to the Recommendation ("Objection"; ECF No. 240).

For the reasons set forth below, the Recommendation is adopted in part, adopted as modified in part, and rejected in part, Plaintiff's Motion for Damages is denied, Plaintiff's Objection is overruled, Defendant Larry Sims's improper objection is

vacated, and Plaintiff is ordered to show cause why judgment should not be entered against him.

## I. LEGAL STANDARD

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommendation] that has been properly objected to." An objection to a recommendation is properly made if it is both timely and specific. *United States v. 2121 East 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996). An objection is sufficiently specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* In conducting its review, "[t]he district court judge may accept, reject, or modify the recommendation; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In considering the Recommendation, the Court is also mindful of Plaintiff's *pro se* status, and accordingly, reads his pleadings and filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007). The Court, however, cannot act as advocate for Plaintiff, who must still comply with the fundamental requirements of the Federal Rules of Civil Procedure. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003). As previously noted, Plaintiff holds himself out as an "M.D., J.D.," thus it appears he has earned a law degree. (ECF No. 1 at 1.) If Plaintiff is a lawyer, he may not be "automatically subject to the very liberal standards

afforded to a non-attorney *pro se* plaintiff because an attorney is presumed to have a knowledge of the legal system and need less protections from the court." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 234 (D.D.C. 2007).

The question addressed by the Recommendation is whether the Court should grant default judgment. Default must enter against a party who fails to appear or otherwise defend a lawsuit. Fed. R. Civ. P. 55(a). Pursuant to Rule 55(b)(1), default judgment must be entered by the Clerk of Court if the claim is for "a sum certain"; in all other cases, "the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). "[D]efault judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection." *In re Rains*, 946 F.2d 731, 732–33 (10th Cir. 1991) (internal quotation marks and citation omitted).

"Even after [entry of] default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Bricklayers & Trowel Trades Int'l Pension Fund v. Denver Marble Co.*, 2019 WL 399228, at *1 (D. Colo. Jan. 31, 2019). Additionally, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002). Although "[s]pecific facts are not necessary" in order to state a claim, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), the well-pleaded

facts must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks omitted).

Moreover, "entry of a default judgment is committed to the sound discretion of the district court." *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016); *see also Greenwich Ins. Co. v. Daniel Law Firm*, 2008 WL 793606, at *2 (D. Colo. Mar. 22, 2008) ("[A] party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the 'sound judicial discretion' of the court."). Therefore, and in conjunction with Plaintiff's timely Objection to the Recommendation, this Court will review the issues before it *de novo*.

## II. BACKGROUND

This dispute revolves around a $250,000 grant and $3,800 rental payment Plaintiff alleges was promised to him by Defendants LDS Financial Charter Service Co. ("LDS"), Blactino Entertainment ("Blactino"), Larry D. Sims ("Larry Sims"), and Jeffery Sims ("Jeffery Sims") (collectively, "Defendants"). At the outset, the Court notes that there is nothing that Plaintiff submits or that the Court can consider in the case's current default judgment posture that explains how the parties met,[1] what LDS and Blactino are, how discussions about the $250,000 grant and $3,800 rental payment came about, how Plaintiff came to believe the Defendants had the resources to give Plaintiff such

---

[1] Nonetheless, the Court will briefly discuss material drawn from Larry Sims's filings in order to provide necessary context. According to Larry Sims, the parties first came into contact after Defendants placed a job posting on an adult entertainment job listing website. (*See, e.g.*, ECF Nos. 90 at 1–2, 124 at 1, 188 at 1, 234 at 1, 244 at 1.) Plaintiff allegedly responded to the advertisement and represented himself as an adult film actor and model. (*Id.*) It appears that during Plaintiff's interview for the position, the parties first discussed Plaintiff's research regarding breast and heart disease, the Grant, and the Rental Payment. (*Id.*)

4

funds, what is the nature of the parties' relationship, among other things. From the Court's perspective, the alleged contract regarding the $250,000 grant and the $3,800 rental payment appeared *ex nihilo* on June 28, 2017.

  The record provides that on that date, LDS sent Plaintiff the following document:



**LDS Financial Charter Services Co (tm)**
140 W 20th Street,340, Pueblo, CO 81008
719.584.3980 888.584.9080

June 28, 2017

Dear Mr. Richard M. Fleming

Greetings! We have been told that we had a RUSOI JOB from Mr. L. D. Sims our CEO, concerning a grant in the amount of $250,000.00 (USD) to be direct deposit in the following account in a Bank of America(s), we need you to forward us that information by email or mail ONLY, you cannot fax this information to us.

Now, we need your last four of your SSI number ___7667___, also, you MUST forward to the above address your complete D.O.B. within 30 days of the Grant, if approved by me, at the time we are told that we or I need to fast track this by July 1. by the close of business. Mr. L.D. Sims - CEO did inform me that you are a *doctor in CA*, please inform us what type of doctor, you are: ___Heart, Cancer___

Under the act of perjury you state by your signature you are the said party listed in the said letter and you understand that under CA as well as State of Colorado Rules and Regs you may cancel this contract within three (3) days from the date of your signature below, if you give willing false information you are and MUST return with 15 days of LDS . Financial Charter Services Co(tm) request by certified mail by USPS.

You, Must inform us if this is a personal grant, of which we are NOT allowed to DO! Yet, if a business Grant we can do this for you, but you MUST inform the IRS of the Grant, at which taxes may be required, that is your cost, not this company.

Thank You
/s/ Kate L. VP/Finance/Sales



By your signature you AGREE that you and your company _FHHI_ have fully READ any and all rules and reg.s of LDS Financial Charter Services Co(tm) _BnS_ you also agree that "NO" funds from this company will be used for any illegal act, acts, action, and actions within or without the USA, nor is this or any fund shall be used to help or assist any person(s) or company(ies), et al that are TERRORIST or anyone or more to harm its citizen within or without the USA, if so you agree to pay back the company in full, plus times ten (10), plus pay and all court cost and fees.

/s/ Richard M. Fleming                    Dated on: 28 June 2017

/s/ Larry D. Sims - CEO                   dated on: 6/28/17

( ) APPROVED    ( )DISAPPROVED and why?

(The "Grant"; ECF No. 146-1 at 4–5.)

Plaintiff wrote on the Grant the last four digits of his social security number, stated that he was a "heart, cancer" doctor, and signed the document.[2]  (*Id.*)  Plaintiff then faxed the document back to Defendants the same day and provided them with his

_____

[2] Larry Sims had signed the Grant before sending the document to Plaintiff.  (ECF No. 124 at 1.)

6

banking information. (ECF No. 146 at 2.) Plaintiff alleges that the Grant was for the "licensing and promotion of breast cancer and [a] heart disease patent." (*Id*.) Plaintiff also claims that in addition to the Grant, Defendants promised to pay for a month of Plaintiff's apartment rent, which amounted to $3,800 ("Rent Payment"). (*Id*.) Over the next few days, Plaintiff started sending Defendants a torrent of e-mails and faxes inquiring about payment. (*See, e.g.*, ECF No. 146-1 at 7–16.)

By July 2, 2017, Defendants had not tendered any money to Plaintiff, and instead "reported that there were power outages, which set them behind several days." (ECF No. 146 at 2.) Defendants "then posted on their website that Jeffrey Sims, brother of CEO Larry D. Sims[,] was hospitalized." (*Id.*) According to Plaintiff, Jeffrey Sims was taken to the emergency room on July 7, 2017, but was never hospitalized. (*Id.*) Plaintiff claims to have "sent several faxes and emails to confirm the guarantee of the [c]ontractually [a]greed to monies and on each occasion plaintiff was assured that the error was on the defendant's end and not the plaintiffs [*sic*] and that the funds were GUARANTEED TO COME TO PLAINTIFF."[3] (*Id*. (emphasis in original).)

Plaintiff also alleges that Larry Sims repeatedly promised to submit the Rent Payment directly to the manager of Plaintiff's apartment complex (the "Apartment Manager"). (*Id.*) During a telephone call between Larry Sims, Plaintiff, and the Apartment Manager, Larry Sims allegedly promised that "he was overnighting a check for $3800 for rent payment including late fees and would send the rest of the $250,000

---

[3] As seen in this sentence, Plaintiff consistently uses the singular form of "defendant" when referring to the Defendants. Therefore, when Plaintiff is quoted herein using the word "defendant," it is in reference to the Defendants.

electronically the following week, but wanted to make certain the rent would be taken care of without delay to avoid eviction of plaintiff."  (*Id.* at 3.)

On July 13, 2017, the Apartment Manager sent a fax to Larry Sims inquiring about the funds.  (*Id.*; *see* ECF No. 146-1 at 22.)  Blactino responded with a fax, stating that Larry Sims was "unable to address this or any matter, due to a serious car accident he was in, he or [*sic*] CEO is now in a COMA, and I as is this office is trying to retrace his action(s) so that we MAY complete them."[4]  (*Id.* at 24 (emphasis in original).)  In addition, Blactino asked the property manager for the amount of rent that it needed to pay.  (*Id.*)  The property manager wrote on the fax her name, number, and the amount due, and sent the document back to Blactino.  (*Id.*)

In response, Jeffery Sims sent a fax to the Apartment Manager that stated, in pertinent part, as follows:

> [Blactino's Letterhead]
>
> I have received you [*sic*] FAX and it was very RUDE, you were told the FACTS of our CEO, and all you can think about is your money...fine since you feel that you have an AGREEMENT with Mr. [Larry] Sims/CEO, upon his issue at hand I am in control and I have now CANCELLED the loan(s)/grant(s), et. al, and any matter concerning that of you or [Plaintiff] had with company...PLEASE understand DO NOT CONTACT THIS COMPANY, BLACTINO[,] or any of its holdings again we are DONE. . . .
>
> Mr. Jeffery R. Sims (Brother), Acting CEO for that of Larry D. Sims, until he is well to proceed.

---

[4] In his Second Amended Complaint, Plaintiff claims that this fax (and the following fax from Jeffery Sims) were from LDS.  (*See* ECF No. 146 at 3.)  However, the e-mails make no mention of LDS and clearly display that they are from Blactino and Jeffery Sims.  (*See id.* at 24–25.)

(*Id*. at 25 (emphasis in original).)  Plaintiff claims that this fax "breach[ed] the contract agreement of the Grant and Rent [P]ayment monies."  (ECF No. 146 at 3.)  Moreover, Plaintiff asserts that "[p]ursuant to the [m]edical [r]ecords departments and the E.R.s of Parkview and St. Mary Cowin Hospitals[,] Mr. Larry D. Sims was not and had not been hospitalized for a coma or anything else."  (*Id*. at 4.)

On July 14, 2017, Plaintiff resumed his barrage of e-mails and faxes to Defendants, demanding funds for the Grant and Rent Payment.  (*See, e.g.*, ECF No. 146-1 at 26–30.)  Two days later, Jeffery Sims responded saying that he had "cancelled any and all matters [Plaintiff] had with [Larry Sims] before his accident and any and all matters concerning the grant/loan."  (*Id*. at 29 (emphasis omitted).)  Plaintiff alleges that he was "evicted for failure to pay rent after detrimentally, reasonably, and foreseeably relying upon the guaranteed rental payment and grant."  (ECF No. 146 at 4 (emphasis omitted).)  Plaintiff notified the Colorado Attorney General's office, the Pueblo County District Attorney's office, the FBI, and the website, Ripoff Report.  (*Id*. at 5.)  According to Plaintiff, "[D]efendants sent a fax to the rental office threatening [P]laintiff for posting the complaint" on Ripoff Report.  (*Id.*)

## III.  PROCEDURAL HISTORY

The procedural history of this case is not easily summarized, but a brief recitation of events will be helpful.[5]  On July 27, 2017, Plaintiff, proceeding *pro se*, filed suit against several defendants (not entirely congruent with the current group of Defendants) for breach of contract, promissory estoppel, fraud, and assault.  (ECF No.

---

[5] This section is largely drawn from the Recommendation, which concisely describes this case's relevant procedural history.  (*See* ECF No. 237 at 2–3.)

1.)  After being ordered to cure certain pleading deficiencies (ECF No. 5), Plaintiff filed

an amended complaint (ECF No. 26) that alleged that those defendants guaranteed

him a grant of $250,000 for the licensing and promotion of a patent associated with

breast cancer and heart disease research, and agreed to make a $3,800 rent payment

for him, but failed to make either payment.  (*Id*. at 3–5.)

An avalanche of filings ensued, including at least 15 motions by Plaintiff for entry

of default, default judgment, and related relief.  (*See* ECF Nos. 66–67, 70, 72, 78–80,

82, 84, 89, 92, 94, 99, 115.)  Plaintiff was eventually given leave to file a second

amended complaint ("Second Amended Complaint"; ECF No. 146), which he did on

January 25, 2018.

The Magistrate Judge held a Scheduling Conference on May 3, 2018, at which

Defendants were given until June 4, 2018, to answer or otherwise respond to Plaintiff's

Second Amended Complaint.[6]  (ECF No. 191 at 4.)  The Magistrate Judge also gave

LDS and Blactino until June 4, 2018, to retain counsel.  (*Id.*)  An Order to Show Cause

was entered, and a Show Cause Hearing and Status Conference was set for June 11,

2018.  (ECF No. 193.)  Defendants were ordered to show cause why default judgment

should not enter against them pursuant to Rule 55 for their failure to answer or

otherwise respond to Plaintiff's Second Amended Complaint, and for LDS and

Blactino's failure to retain counsel.  (*Id*.)

Defendants did not appear on June 11, 2018 for the Show Cause Hearing, nor

---

[6] Since the filing of the initial complaint, this case has been assigned to four Magistrate Judges.  (*See* ECF Nos. 2, 27, 176, 213.)  To avoid confusion, this Court will use the term "the Magistrate Judge," even though the Court is at times referring to different Magistrate Judges.

did they answer or otherwise respond to Plaintiff's Second Amended Complaint. (ECF No. 202.) Accordingly, that day, the Magistrate Judge recommended that judgment be entered against Defendants as a sanction for their failure to comply with the court's orders and the federal and local rules of civil procedure. (ECF No. 203.)

On August 21, 2018, this Court adopted the recommendation in its entirety, and referred the matter back to the Magistrate Judge for a recommendation as to the scope and content of the default judgment to be entered against the Defendants. (ECF No. 217.) The Clerk of Court then entered a Rule 55(a) default against the Defendants (ECF No. 218), and Plaintiff filed a motion for damages (ECF No. 219).

The Magistrate Judge held a hearing on the entry of default judgment on September 26, 2018 ("Default Judgment Hearing"). (ECF No. 233.) Plaintiff and Larry Sims appeared at the Default Judgment Hearing by telephone, and the Magistrate Judge heard argument and testimony by both. (*Id.*) On October 31, 2018, the Magistrate Judge issued his Recommendation. (ECF No. 237.)

## IV.  ANALYSIS

The Magistrate Judge recommended that: (1) default judgment be entered in favor of Plaintiff and against LDS; and (2) Plaintiff's Motion for Damages (ECF No. 219) be granted in part and denied in part, with Plaintiff being "awarded breach of contract damages against LDS in the amount of $235,800, with pre- and post-judgment interest of 8% compounded annually from July 16, 2017." (ECF No. 237 at 15.) The Magistrate Judge made several findings to reach these recommendations.

Plaintiff and Larry Sims object to the Magistrate Judge's findings supporting his recommendation. (ECF Nos. 240 & 241.) However, since the only Defendant whose

interests were adversely affected by the Recommendation is LDS, Larry Sims's objection is improper under Rule 72. While it is undisputed that Larry Sims is the CEO of LDS, it is well established that, although a natural person may represent himself or herself in court, a business entity must be represented by counsel. *See Flora Constr. Co. v. Fireman's Fund Ins. Co.*, 307 F.2d 413, 414 (10th Cir. 1962). Therefore, Larry Sims's objection will be vacated, and the Court will only address the Magistrate Judge's findings and Plaintiff's objections.

Before proceeding to its analysis of Plaintiff's claims, however, the Court must first determine whether it has personal jurisdiction over the Defendants and subject matter jurisdiction over the action. *See Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202–03 (10th Cir. 1986). In the Recommendation, the Magistrate Judge found that this Court had personal jurisdiction over the Defendants since they had been properly served with process and original jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332. (ECF No. 237 at 6.) Neither party objected to this finding and therefore this Court finds that the first step to granting default judgment has been met.

In addition, the Court must determine what law to apply. Federal courts sitting in diversity rely on the forum state's choice of law principles. *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1143 (10th Cir. 2009). With one exception noted below, no party has argued for this Court to apply the law of any particular state. Therefore, the Court will apply Colorado law during the final step in determining whether default judgment should be granted—whether Plaintiff's well-pleaded allegations of fact support a judgment on his claims against the Defendants.

12

*See Fed. Fruit & Produce Co. v. Red Tomato, Inc.*, 2009 WL 765872, at *3 (D. Colo.

Mar. 20, 2009) ("Even after entry of default, however, it remains for the court to

consider whether the unchallenged facts constitute a legitimate basis for the entry of a

judgment.").

## A.     Breach of Contract Claim

In regard to Plaintiff's breach of contract claim, the Magistrate Judge made the

following findings:

> On June 28, 2018, [Plaintiff] and Larry D. Sims, as CEO of
> LDS, signed an agreement wherein LDS agreed to provide a
> grant in the amount of $250,000 to [Plaintiff].  [Plaintiff], a
> nuclear cardiologist, testified that LDS agreed to provide the
> grant, along with a $3,800.00 payment for [Plaintiff's] rent, in
> order to aid him in developing and marketing his patent for
> nuclear imaging technology, which can be used in detecting
> breast cancer and heart disease. . . .  [Plaintiff] testified that
> LDS failed to deposit the $250,000 in his bank account and
> failed to wire the rental payment to his property manager,
> and that he incurred damages as a result.

(ECF No. 237 at 7–8 (internal citation omitted).)  The Magistrate Judge then determined

that, "[b]ased upon the allegations in the Second Amended Complaint and the

testimony proved at the [Default Judgment H]earing, the Court finds that [Plaintiff] had a

valid contract with LDS."  (*Id*. at 7.)

The Magistrate Judge then went on to find that LDS had breached its contract

with Plaintiff when it failed to provide the $250,000 for the Grant and the $3,800 for the

Rental Payment.  (*Id*. at 7–9.)  The Magistrate Judge found, however, that Plaintiff only

had a valid breach of contract claim against LDS, and not the other defendants.  (*Id.* at

8–9.)  Accordingly, the Magistrate Judge recommended that default judgment be

entered in favor of Plaintiff and against LDS only on the breach of contract claim.  (*Id*. at 9.)

Under Colorado law, a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  Thus, if the Court finds that a valid contract did not exist between the parties, Plaintiff's claim for breach of contract will fail.  (*Id.*)  Pursuant to Colorado law, "contracts are formed when there are unambiguous terms, an offer, and acceptance of that offer."  *Kovac v. Farmers Ins. Exch.*, 401 P.3d 112, 116 (Colo. App. 2017) (citing *Yaekle v. Andrews*, 195 P.3d 1101, 1111 (Colo. 2008)).

After an exhaustive review of the record, the Second Amended Complaint, and the testimony provided at the Default Judgment Hearing, the Court cannot come to the conclusion that a valid contract was formed between the parties.  While there are many reasons why the Court cannot reach that conclusion, only a few need be addressed.

Under Colorado law, courts "can supply some elements in a contract, but they cannot make one; and when the language in a contract is too uncertain to gather from it what the parties intended, the courts cannot enforce it."  *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960).  After meticulously reviewing the Grant, the Court finds the language and the terms in the Grant to be so ambiguous and difficult to comprehend that the Court cannot discern from the document what the parties intended.  One thing

is for certain, the terms and language of the Grant simply do not permit the Court to find that the document was intended to be an enforceable contract between the parties, whereby Defendants are promising to grant $250,000 to Plaintiff for the licensing and promotion of a patent for breast cancer and heart disease research and to pay $3,800 to Plaintiff for his apartment rent, in exchange for (as the Court will address more fully below) Plaintiff "determin[ing] if there were acting instructors plaintiff could identify, which would be willing to help teach defendant's actors how to act." (ECF No. 146 at 8.)  Because the language in the Grant is too uncertain to ascertain from it what the parties intended, the Court cannot enforce it.  *See Stice*, 355 P.2d at 952.

While the Grant is a document in the record (ECF No. 146-1 at 4–5), Plaintiff has provided no such documentation for the Rental Payment.  In fact, the Court has no idea where the alleged Rental Payment agreement came from or indeed if there exists a document laying out its terms.  The first time the Rental Payment is mentioned is on July 2, 2017, in an e-mail from Larry Sims informing Plaintiff of delays due to high wind and a power outage.  (*Id*. at 6.)  True, it is beyond dispute that the Rental Payment was a part of the parties' discussions.  But it is also beyond dispute that the Rental Payment was not referenced in the Grant, and that there is certainly not enough in the record for the Court to find that there was a valid contract between the parties concerning the Rental Payment.

In addition, "[a]n offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."  *Stice*, 355 P.2d at 952 (quoting Restatement (First) of Contracts § 32 (1932)).  A review of the Grant, as well as Plaintiff's exhibits, leaves the

Court utterly at a loss to understand what promises or performances Plaintiff was to render. It is not until Plaintiff's Second Amended Complaint that Plaintiff alleges, without support, the following assertion:

> [c]ontractual performance by the plaintiff included the defendant's request for plaintiff to determine if there were acting instructors plaintiff could identify, which would be willing to help teach defendant's actors how to act. Plaintiff completely performed on this by talking with acting instructors who confirmed that they would be willing to include defendant's actors in their classrooms for training, as long as defendant's actors followed the rules and behavior required. Plaintiff completely performed on this.

(ECF No. 146 at 8–9.) The Grant and the plethora of exhibits Plaintiff has provided, however, are completely devoid of any reference to this alleged promise. In fact, Defendants have consistently maintained since their first filing that they "have never ask[ed] this person for anything." (ECF No. 7 at 1; *see also* ECF No. 90 at 2.) Thus, the Court finds that the promises and performances to be rendered by each party are not reasonably definite in their terms. As a consequence, the Court has serious doubts as to whether there was an "offer," as required for a valid contract. *See Stice*, 355 P.2d at 952.

Moreover, under Colorado law, "[t]he general rule is that when parties to a contract ascribe different meanings to a material term of a contract, the parties have not manifested mutual assent, no meeting of the minds has occurred, and there is no valid contract." *Sunshine v. M. R. Mansfield Realty, Inc.*, 575 P.2d 847, 849 (Colo. 1978). Similarly, "if the parties omit entirely an essential term, resulting in an alleged contract that is so uncertain the court cannot determine whether or not it has been breached, there is no contract." *Jorgensen v. Colo. Rural Props., LLC*, 226 P.3d 1255, 1260

(Colo. App. 2010) (citing *Stice*, 355 P.2d at 952).

After a careful review of the record, it is readily apparent that there was no meeting of the minds between the parties as to the essential terms of the Grant and therefore there was no valid contract between the parties. For instance, it appears from the record that an essential term of the Grant is its final provision, which states that the document needed to be approved by the Defendants. In particular, Larry Sims has taken the position that approval of the Grant was an essential term and that the contract was not valid until he or LDS had given explicit approval. For example, Larry Sims states the following:

> [Y]es the Defendant, Larry D. Sims did forward the Plaintiff a FAX copy of an agreement under the understanding that the same MUST be APPROVED and [Plaintiff] would forward any and all paperwork concerning this project he claimed, but HE, the Plaintiff[,] never did[.] [H]e did forward the file number at which he was told that was not enough.

(ECF No. 90 at 1 (emphasis in original); *see also* ECF Nos. 90 at 2, 100 at 2, 124 at 1.)

Plaintiff, however, has been surprisingly silent as to these arguments. (*See, e.g.*, ECF Nos. 92 & 126.) Nonetheless, whatever Plaintiff's position may be in regard to whether approval was needed, it seems clear that his position will be at odds with Larry Sims's interpretation of the approval term. Since the parties ascribe different meanings to this very essential term in the Grant, the parties have not manifested mutual assent, and as a result the Court finds that no meeting of the minds between the parties as to the essential terms of the putative contract ever took place. *See Sunshine, Inc.*, 575 P.2d at 849. In addition, there is a question as to whether the Rental Payment and Plaintiff's alleged promise to locate acting instructors are essential terms to the Grant.

17

If they are, their omission from the Grant could likewise result in an invalid contract.[7]

In sum, the Court finds that Plaintiff has failed to establish a valid claim for breach of contract. Accordingly, the Recommendation is rejected in regard to its finding that Plaintiff had a valid breach of contract claim against LDS, and is adopted as modified in regard to its finding that Plaintiff had failed to establish a claim against Blactino, Larry Sims, and Jeffery Sims.

**B.  Promissory Estoppel Claim**

In the Recommendation, the Magistrate Judge found that Plaintiff had failed to establish a promissory estoppel claim and therefore recommended that default judgment on the claim not be entered in Plaintiff's favor. (ECF No. 237 at 10.) The Magistrate Judge's analysis of Plaintiff's promissory estoppel claim, however, was premised on his prior finding that the parties had formed an enforceable express contract. (*Id*. at 9–10.) This premise clearly no longer obtains, as the Court has held that no valid express contract existed between the parties.

A claim for promissory estoppel consists of four elements: "(1) a promise; (2) that the promisor reasonably should have expected would induce action or forbearance by the promisee or a third party; (3) on which the promisee or third party reasonably and detrimentally relied; and (4) that must be enforced in order to prevent injustice."

---

[7] The Court need not address the arguments made in Plaintiff's Objection, other than those related to his assault claim, since the arguments do not address the findings made in this Order. For instance, the arguments made in the Objection in regard to the breach of contract claim focus on how all Defendants, and not just LDS, should be liable. (ECF No. 240 at 1–10.) This argument, however, is not applicable here as the Court has found that Plaintiff does not have a valid breach of contract claim in the first place. Plaintiff will have the opportunity to address the findings of this Order in his response to the Order to Show Cause.

*Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1221 (Colo. 2016).  "Where these elements are present, a promise becomes binding and may be enforced through the normal remedies available under contract law."  *Id*.

The Court need not discuss whether the first and second elements of promissory estoppel are present, because it is abundantly clear that Plaintiff has not established the third element—that his reliance on Defendants' alleged promise was reasonable. Plaintiff alleges that his reliance was reasonable because he was "repeatedly told by defendants that the monies would be coming."  (ECF No. 146 at 10.)  In addition, Plaintiff claims that his reliance was reasonable because the Defendants "had offered the monies in exchange for the assistance in obtaining acting instructors for their actors."  (*Id*.)

The expansive record, however, is wholly devoid of anything that lends support to the notion that Plaintiff's reliance in Defendants' alleged promise was reasonable.  At the outset, the Court finds that the nearly incomprehensible Grant, e-mails, and faxes sent by the Defendants to Plaintiff, support the finding that any reliance on these documents is unreasonable.  The Grant and Defendants' written communications were more than enough to put the recipient on notice that it was highly improbable that the Grant was legitimate.  In addition, Plaintiff provides no context as to the background of Defendants' alleged promise that could make Plaintiff's reliance seem more reasonable.  On the contrary, what little the Court does glean from the record as to the background of Defendants' alleged promise makes Plaintiff's reliance appear, if anything, to be even more unreasonable.  (*See, e.g.*, ECF Nos. 188, 234, 244.)

At the Default Judgment Hearing, the dialogue between the Magistrate Judge

and Plaintiff provides this Court with further insight into the reasonableness of Plaintiff's

alleged reliance:[8]

> Magistrate Judge: What allowed you to think that Larry Sims
> and his companies had $250,000 . . . ?  What caused you to
> think that this was somebody if he tells me he is going to
> give me $250,000 that he is bona fida to do so?
>
> Plaintiff: He has advertised on the internet and even on
> Facebook that they provide monies for people who are
> looking for it. . . .
>
> Magistrate Judge: What made you think he was legit in any
> way, shape, or form?  I am looking at this [Grant] document
> where you give him the last four digits of your social security
> number and that raises a lot of red flags for me. . . .  [W]hat
> made you think he was someone who would actually be able
> to provide you with $250,000?
>
> Plaintiff: [Larry] Sims has multiple things posted on the
> internet that talked about his company being a company that
> provides monies to people.  He's on LinkedIn, he's on
> Facebook, he's on multiple things, I spoke with him about
> this and he assured me they were more than able to provide
> these monies.

Accordingly, Plaintiff bases his reliance on Larry Sims's advertisements,

Facebook, and LinkedIn account, as well as his telephone conversations with Larry

Sims.  The Court need not go into detail about whether Plaintiff's reliance on the

Internet postings was reasonable, because even a cursory glance at them, as provided

by Plaintiff, can only lead to the conclusion that such reliance cannot plausibly be

deemed reasonable.  (*See, e.g.*, ECF Nos. 12-1 at 4–5, 36 at 1–3, 59 at 2, 183 at 12,

224-5 at 9.)  Moreover, after examining the Default Judgment Hearing testimony, the

---

[8] The following is the Court's own transcription of the audio recording from the Default
Judgment Hearing.

Court finds that any reliance based on Plaintiff's prior telephone conversations with Larry Sims also cannot be deemed reasonable.

In regard to the fourth element of promissory estoppel—that the promise must be enforced in order to prevent injustice—the Court finds the opposite to be true. In other words, the Court finds that an injustice would result if Defendants' alleged promise was enforced. The Court frankly suspects that if there is any victim here, it is the Defendants. Accordingly, the Recommendation is adopted in regard to its finding that Plaintiff had failed to establish a valid promissory estoppel claim against the Defendants, although clearly for different reasons as set forth above.

## C.    Fraud Claim

In the Recommendation, the Magistrate Judge found that Plaintiff had failed to establish a fraud claim and therefore recommended that default judgment on the claim not be entered in Plaintiff's favor. (ECF No. 237 at 11.) The Magistrate Judge's analysis of Plaintiff's fraud claim, however, was also predicated on his prior finding that Plaintiff had a valid contract claim. (*Id*. at 10–11.) Since this Court has found that Plaintiff does not have a valid contract claim, the Court need not further discuss the Magistrate Judge's findings in regard to Plaintiff's fraud claim.

This claim is largely centered on several allegedly false excuses given by Defendants in regard to delays in their processing and paying the Grant and Rent Payment. These excuses include delays resulting from "inclement weather conditions" (ECF No. 146-1 at 6), accumulation of other applications (*id*. at 19), and the hospitalization of Larry and Jeffrey Sims (*id*. at 15, 19, 24, 29). (ECF No. 146 at 14.) In

addition, Plaintiff alleges that Defendants committed fraud when they "falsely contacted the [Apartment Manager] and guaranteed [her] that monies would be coming for plaintiff's rent." (*Id*.) Finally, Plaintiff claims that Defendants committed fraud by including the names "Kate Lewis and Mary Lopez" on the signature line of several documents. (*Id*.)

A plaintiff seeking to prevail on a claim of fraud must establish: "(1) that the defendant made a false representation of material fact; (2) that the one making the representation knew that it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff." *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012).

Plaintiff has failed to establish the elements of fraud, and in particular, the fourth element—that the false representation was made with the intention that it be acted upon. In the Second Amended Complaint, Plaintiff more or less recites the elements of fraud. (*See id*. at 14–15.) For instance, in regard to the third element—that the one making the representation knew that it was false—Plaintiff states: "[a]ll of these false promises were known by the defendants to be false." (ECF No. 146 at 14.) Plaintiff, however, does not argue that the Defendants made the false promises with the intention that they be acted upon, and to the Court, it is unclear whether such an argument can be made in regard to Defendants' actions. In other words, Defendants' alleged misrepresentations, that Plaintiff claims are tantamount to fraud, are simply not the sort of misrepresentations that induced any action other than continuing to wait for the Grant money allegedly promised—which is the subject of Plaintiff's contract claim

and which Plaintiff could not have reasonably expected to receive in any event. Therefore, the Recommendation is adopted in regard to its finding that Plaintiff had failed to establish a valid fraud claim against the Defendants, although for different reasons as set forth above.

**D.      Assault Claim**

After Plaintiff posted a negative review about LDS and Blactino on the website "Ripoff Report," Larry Sims sent a fax to the Apartment Manager, which stated, in pertinent part, as follows:

> From Larry D. Sims - CEO of both [LDS] and [Blactino]
>
> Subject: NOTICE OF INTENT, et al
>
> To: Dr. Richard M. Fleming
>
> Now, we received some disident [*sic*] NEWS that you wrote a SLANDEROUS REMARK and LIABLE REMARK about me and my company, if you did that we ask that you seek the advice of an attorney NOW...for we plan to sue you for everything you got. . . .  [Y]ou think you can talk bad about my business "I DON'T THINK SO and stop sending us any faxes NOW".

(ECF No. 146-1 at 35 (emphasis in original).)  Plaintiff claims that Defendants are liable for assault because this fax "placed Plaintiff in imminent apprehension of harm including physical harm to himself and his son" by "placing [them] in circumstances where they would be and now are homeless with constant physical threat and loss of any permanent shelter, threatening the physical safety and life of Plaintiff and his son." (ECF No. 146 at 15–16.)

In the Recommendation, the Magistrate Judge found that Plaintiff had failed to establish a valid assault claim.  (ECF No. 237 at 12.)  In particular, the court found that

23

the "conduct described by [Plaintiff] does not implicate the sort of 'apprehension of harm' that gives rise to battery or assault liability." (*Id*.)

Pursuant to Colorado Law, for a plaintiff to establish a claim for assault, the following elements must be proved: "(1) the defendant acted either with the intent of making a contact with the person of the plaintiff or with the intent of putting the plaintiff in apprehension of such a contact; (2) the plaintiff was placed in apprehension of an imminent contact with his or her person by the conduct of the defendant; and (3) such contact was or appeared to be harmful or offensive." *Adams v. Corr. Corp. of Am.*, 187 P.3d 1190, 1198 (Colo. App. 2008).

Plaintiff has clearly failed to prove these elements. It is indisputable that Larry Sims did not send the fax to the Apartment Manager with the intent of making physical contact with Plaintiff or with the intent of putting Plaintiff in apprehension of physical contact. Moreover, Plaintiff cannot reasonably argue that the fax put him in apprehension of imminent physical contact. Accordingly, the Court agrees with the Magistrate Judge that Plaintiff has failed to establish a valid claim for assault.

In his Objection, Plaintiff argues that the Court should apply the law of California in determining whether the Larry Sims's fax constituted an assault. (ECF No. 240 at 12.) Pursuant to California law, for a Plaintiff to establish a claim for assault, the following elements must be proved: "(1) the defendant acted with intent to cause harmful or offensive contact, or threatened to touch the plaintiff in a harmful or offensive manner; (2) the plaintiff reasonably believed he was about to be touched in a harmful or offensive manner or it reasonably appeared to the plaintiff that the defendant was about to carry out the threat; (3) the plaintiff did not consent to the defendant's conduct; (4)

the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Carlsen v. Koivumaki*, 174 Cal. Rptr. 3d 339, 351 (App. 2014). Once again, even under California law, Larry Sims's conduct cannot reasonably be construed to be the sort of "harmful or offensive contact" that gives rise to potential assault liability.

Finally, Plaintiff argues that if "[California's] definition of 'assault' is unsatisfactory for inclusion in the claims and damages" then, "pursuant to Colo. Rev. Stat. § 18-3-204, the applicable legal term would be 'Menacing.'" (ECF No. 240 at 12.) Plaintiff then notes that "if the Court believes the definition for the defendant's actions is more correctly menacing that [*sic*] assault, damages should still be awarded to plaintiff accordingly." (*Id.*) The statute that Plaintiff cites, however, is a criminal statute regarding assault in the third degree. In addition, nowhere in the text, or in prior versions of the statute, is the word "menacing" mentioned and the Court cannot determine how the statute could be applicable to this case. Therefore, the Court finds this particular objection to be wholly without merit. In conclusion, the Recommendation is adopted in regard to its finding that Plaintiff had failed to establish a valid assault claim against the Defendants.

## E. Final Remarks

The Court finds that Plaintiff's well-pleaded allegations of fact do not give rise to legitimate causes of actions against Defendants. Moreover, the Court reiterates that Plaintiff is not entitled to default judgment as of right, but instead entry of default judgment is entrusted to the sound judicial discretion of the Court. After an exhaustive

examination of the entire record, the Second Amended Complaint, and the Default Judgment Hearing testimony, the Court finds it clear that Plaintiff has not established a valid claim against the Defendants. Accordingly, default judgment will not be entered in Plaintiff's favor and Plaintiff's Motion for Damages is denied. As previously mentioned, the Court frankly suspects that if there is any victim here, it is the Defendants. Therefore, Plaintiff will be Ordered to Show Cause why judgment should not be entered against him.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Magistrate Judge's Recommendation (ECF No. 237) is ADOPTED IN PART, ADOPTED AS MODIFIED IN PART, and REJECTED IN PART, as stated above;

2. Plaintiff's Motion for Damages (ECF No. 219) is DENIED;

3. Plaintiff's Objection (ECF No. 240) is OVERRULED;

4. Defendant Larry Sims's Objection (ECF No. 241) is VACATED; and

5. Pursuant to Federal Rule of Civil Procedure 56(f), Plaintiff is ORDERED TO SHOW CAUSE, on or before **March 15, 2019**, why judgment should not be entered against him. Plaintiff may attach to his response affidavits, declarations, and other supporting evidence, as appropriate. Defendants are granted leave, but not ordered, to file a response to Plaintiff's Order to Show Cause response on or before **March 29, 2019**.

Dated this 28th day of February, 2019.

BY THE COURT:

_____

William J. Martínez
United States District Judge